```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA        :
                                :    ORDER
    v.                          :
                                :    14 CR 420 (VB)
RICKY PATRICK HESTER,           :
                Defendant.      :
--------------------------------------------------------x
```

Now pending is defendant Ricky Patrick Hester's motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) to reduce his term of imprisonment to time served in light of the ongoing COVID-19 pandemic and his underlying health conditions. (Docs. ##104, 108).

For the following reasons, the motion is GRANTED.

The background of this case is as follows. On June 23, 2015, Hester was convicted by a jury of possessing and distributing child pornography. Following the verdict, he was remanded. On January 6, 2016, the Court imposed a sentence of 97 months' imprisonment, followed by a lifetime term of supervised release. To date, Hester has served approximately 73 months of his prison sentence, or about 75% of the sentence imposed. According to the Bureau of Prisons ("BOP"), Hester's expected release date is May 12, 2022, meaning he has served approximately 88% of his likely prison term.

The facts underlying the offense are appalling. Hester, a cadet at the United States Military Academy at West Point, used his email account to send or receive more than 600 emails containing or relating to child pornography, including depictions of young children engaged in sexual acts, such as masturbation and intercourse. One of Hester's emails contained the following text: "Do you trade videos of boys? I love man boy hardcore." Another said: "Do you trade videos of boys? I am into 4-10 year olds hardcore with sound." More than 1,200 images and videos of child pornography were found on Hester's cellphone, and he also used a Dropbox

1

account to collect and trade such images and videos. When confronted by law enforcement officers executing a search warrant in his West Point dorm room, Hester admitted he used his email and Dropbox account to trade images and videos of child pornography.

At sentencing, the Court carefully considered all of the factors set forth in 18 U.S.C. § 3553(a), including the applicable advisory Guidelines range of 292-365 months' imprisonment. The Court found that range to be unreasonably harsh and irrational, notwithstanding the seriousness of the offense, because most of the pertinent specific offense characteristics applied in nearly every case involving the distribution of child pornography, and thus the range failed to distinguish between the culpability of various offenders convicted of child pornography offenses.

Among other things, the Court stated:

> This is truly a perplexing case. On the one hand, Mr. Hester is intelligent, accomplished, well-liked, even admired by family and friends and now by fellow inmates at the Metropolitan Detention Center. He did well in school, in the military, and he's a church and community volunteer, and this, of course, is his first encounter with the criminal justice system.
>
> On the other hand, the evidence presented at trial including his confession clearly shows that he actively sought out and traded images and videos of child pornography, principally images of young boys being sexually abused by adult males or engaged in sex acts with each other. The evidence is overwhelming that he received, distributed, and possessed approximately 1,200 images and/or videos containing child pornography.

(Sentencing Tr. 31-32).

In the end, after a close analysis of the child pornography guidelines as applied to the facts of this case, the Court determined that a rational sentencing range was 97 to 121 months' imprisonment, and imposed a sentence at the bottom of the range. The Court took several mitigating factors into account, including Hester's youth, military service, and lack of criminal record, as well as the fact that he neither produced the child pornography nor had any hands-on inappropriate contact with minors, and concluded that 97 months' imprisonment, followed by a

lifetime term of supervised release, was sufficient but not greater than necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.

Although this sentence was fair and reasonable at the time it was imposed, under Section 3582(c)(1)(A)(i), the Court is authorized, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," to reduce Hester's term of imprisonment if "extraordinary and compelling reasons warrant such a reduction."

This is a close call. However, taking into account both Hester's current medical condition and the risk of serious complications if he were to contract COVID-19 in prison, as well as the Section 3553(a) factors, the Court finds that extraordinary and compelling reasons are present here.

According to Hester's BOP medical records, he suffers from a rare blood disease called essential thrombocythemia, for which he is prescribed the drug hydroxyurea. (Doc. #108, Ex. B). Essential thrombocythemia is a type of myeloproliferative neoplasm, and, as such, is a form of blood cancer in which the bone marrow produces too many platelets, which may lead to a thrombus or blood clot. Blood clots can cause serious and life-threatening health problems, such as a stroke, heart attack, or pulmonary embolism. See Essential Thrombocythemia, Leukemia & Lymphoma Society, https://www.lls.org/myeloproliferative-neoplasms/essential-thrombocythemia (last visited July 12, 2021). According to the Centers for Disease Control and Prevention ("CDC"), a person who has cancer has an underlying medical condition that makes it more likely he will become seriously ill, or die, if he contracts COVID-19. See People with Certain Medical Conditions, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-

precautions/people-with-medical-conditions.html (last visited July 12, 2021). Moreover, although not definitive, a recently published study found that persons suffering from essential thrombocythemia are at the greatest risk of developing blood clots when infected with COVID-19. See Barbui, T., et al., Among classic myeloproliferative neoplasms, essential thrombocythemia is associated with the greatest risk of venous thromboembolism during COVID-19, Blood Cancer Journal (published Feb. 4, 2021), https://www.nature.com/articles/s41408-021-00417-3 (last visited July 12, 2021).

Hester's medical records also reflect he has received one dose of the Moderna vaccine for COVID-19, and that he "refused" the second dose. (Doc. #114, Ex. Q). The government contends Hester's refusal to complete his vaccination means his medical condition does not constitute an extraordinary and compelling reason under Section 3582(c)(1)(A)(i). However, the Court is satisfied Hester had legitimate reasons for refusing the second dose, namely that he was feeling unwell and experiencing chest pains at the time, BOP medical staff told him not to take the vaccine if he did not feel well, and medical staff were unable to answer his question as to whether he was more at risk for blood clots from the vaccine due to his essential thrombocythemia. (Doc. #114, Exs. Q, R; Doc. #115, Hester Declaration, dated June 14, 2021). Moreover, although the vaccine dramatically reduces the risk of contracting COVID-19, it does not eliminate that risk. See Moderna COVID-19 Vaccine Overview and Safety, CDC, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html (last visited July 12, 2021). Given the nature of Hester's condition, and the real risk of serious complications or death if he were to contract COVID-19, the Court is not willing to find that Hester, even if he is partially or fully vaccinated, is not in serious danger from COVID-19, especially while living in the congregate setting of a correctional facility.

Under Section 3582(c)(1)(A), the Court is also required to consider the sentencing factors set forth in Section 3553(a), to the extent they are applicable. Having done so, the Court finds that the sentencing objectives in this case—promoting respect for the law, providing just punishment, affording adequate deterrence, and protecting the public—will be satisfied by a combination of the 73 months Hester has already spent in prison (a substantial portion of which was served during a pandemic, with its attendant restrictions on movement and visitation), followed by a lifetime term of supervised release, with a special condition of six months' home incarceration. Hester has served 75% of the 97-month prison term imposed and 88% of his likely prison term. His prison record reflects that he spent his time in prison productively—he has had several different work assignments, including as a GED tutor for other inmates and teaching several Adult Continuing Education ("ACE") classes, and even becoming the inmate coordinator for FCI Elkton's ACE program. He has no disciplinary infractions. (Doc. #108, Exs. I, J, K).

Moreover, after completing his prison sentence, Hester will commence a lifetime term of supervised release, including several sex-offender specific special conditions of supervision, which the Court believes will substantially mitigate the risk of re-offense and, by extension, protect the public from further crimes of the defendant.

Importantly, Hester has now accepted full responsibility for his offense: "I am not innocent of the crime I was convicted of. I am guilty as charged. I came clean to this fact at a Celebrate Recovery meeting at FCI Elkton. There is not a day that goes by that I do not wish I would have come clean and told the truth sooner." (Doc. #108, Ex. M). And the Court takes Hester at his word: "Your Honor, there is no way to change the past, but I can change the future.

I will work every day to make amends for the man I was. That has started here in prison and extends to when I get out." (Id.).

Finally, the Court is persuaded that Hester will be entering a stable environment upon his release. He will be living with his mother, who has committed to working with the Probation Department to help ensure her son remains compliant with his conditions of supervised release. (Doc. #108, Ex. L). The Court expects her to do just that. The Court also expects—and expresses its appreciation in advance—that Hester's attorney will assist his client in smoothly transitioning from prison to supervised release and home incarceration. Accordingly, the Court approves this release plan.

In short, the Court concludes that extraordinary and compelling reasons warrant a reduction of Hester's term of imprisonment to time served.

## **CONCLUSION**

Defendant Ricky Patrick Hester's motion pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) is GRANTED, and his term of imprisonment is reduced to time served—effective July 19, 2021— to be followed by a lifetime term of supervised release.

**To allow sufficient time for the Probation Department and the Bureau of Prisons to make appropriate arrangements for Hester's release, this Order shall become effective on July 19, 2021. To be clear, the Court ORDERS the Bureau of Prisons to release defendant on Monday, July 19, 2021, by no later than 12:00 p.m.**

With respect to the term of supervised release, the following additional conditions of supervised release, all of which are rationally related to the underlying offense of conviction and the Section 3553(a) factors, are imposed:

1.      Defendant shall serve the first six months of his term of supervised release on home incarceration at the home of Kim Ingram, in Granger, Indiana, to be enforced by GPS monitoring. Installation of a GPS monitoring device shall occur immediately after the fourteen-day period of self-quarantine (described in item 2 below). During the period of home incarceration, defendant must remain at home except as necessary for medical treatment, which will require prior notice to, and approval by, the Probation Department, unless the medical treatment involves a true emergency. If, after thirty days of home incarceration, the Probation Department believes it is appropriate, the defendant will be permitted to leave home for the purpose of employment or other pre-approved activities.

2.      In light of the COVID-19 pandemic, defendant shall, upon release from custody, self-quarantine for fourteen days, physically distancing himself from any other occupants of his home.

3.      Defendant shall possess or have access to a telephone that will allow for video conferencing with the Probation Department. This requirement shall remain in effect during the entire period of home incarceration, unless waived by the Probation Department or the Court.

4.      Immediately upon his release from custody, defendant shall contact Supervisory U.S. Probation Officer Kevin Mulcahy (914-390-4048) to arrange for the installation of a GPS monitoring device.

Dated: July 12, 2021
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge